IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

PATRICIA BRESLIN,

                Plaintiff,

     v.

COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION,

                Defendant.

HONORABLE JEROME B. SIMANDLE

Civil No. 13-1190

**OPINION**

APPEARANCES:

Robert A. Petruzzelli, Esq.
Jacobs, Schwalbe & Petruzzelli, PC
Woodcrest Pavilion
Ten Melrose Avenue
Suite 340
Cherry Hill, NJ 08003
    Attorney for Plaintiff

Jason P. Peck, Special Assistant U.S. Attorney
c/o Social Security Administration
Office of the General Counsel
26 Federal Plaza
Room 3950
New York, NY 10278
    -and-
Thomas C. Gray, Esq.
Social Security Administration
Office of the General Counsel
26 Federal Plaza
Room 3904
New York, NY 10278
    Attorneys for the Commissioner of the Social Security
    Administration

**SIMANDLE**, Chief Judge:

**I.   INTRODUCTION**

This matter comes before the Court on Plaintiff Patricia Breslin's appeal of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for Disability Insurance Benefits under Title II of the Social Security Act ("Act").

Plaintiff argues that the Administrative Law Judge ("ALJ") improperly evaluated her Residual Functioning Capacity and failed to consult a vocational expert. The Court holds that substantial evidence supported the ALJ's decision, particularly his finding that Plaintiff lacked credibility about her substance abuse, and that a vocational expert was not required because the ALJ did not reach step five of the sequential analysis. The Court will affirm the Commissioner's decision.

**II.  BACKGROUND**

**A. Procedural History**

Plaintiff filed an application for disability benefits on September 2, 2010 alleging an onset of disability on September 30, 2009 due to lumbar degenerative disc disease, schizoaffective disorder, and mood disorders. (R. at 59.) Her application was denied initially and on reconsideration. (R. at 68, 82.) Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"), which occurred on March 6, 2012. (R. at 88, 29.) The ALJ

issued an opinion denying her application. (R. at 10-28.) Plaintiff requested and was denied review by the Appeals Council. (R. at 7, 1.) The ALJ's March 6, 2012 Opinion then became the Commissioner's final decision. Plaintiff timely filed this action. This Court has jurisdiction to review the Commissioner's decision under 42 U.S.C. § 405(g).

**B. Plaintiff's Statements**

Plaintiff testified at her hearing that she is a 47-year-old high school graduate. (R. at 33.) She attended St. Anne's Business School for two years after high school. (R. at 56.)

She worked as a server at various coffee shops and restaurants. (R. at 35.) When asked if she "ha[d] difficulty performing those jobs," she said "no" and did not remember why she left the server jobs. (R. at 35.) When asked whether it was "accurate" that she "found it difficult to work as a server, especially during the rushes when there were a lot of people that came into the restaurant," she responded "[y]es, I can't be around a lot of people due to my disability." (R. at 36.)

After working as a server, she obtained her Certified Nursing Assistant (CNA) license. (R. at 33-34.) She worked as a CNA for eight months in 2000 at the Victoria Manor Nursing Home. (R. at 34.) She left that position because she "was having an abusive relationship" and "my boyfriend used to bring my kids to my job and . . . my boss said it would better if . . . I didn't work

there anymore." (R. at 34.) When asked whether she also left the job because she was "having difficulty dealing with the fact that patients there would pass away," she responded "[t]hat's true, too." (R. at 35.) She did not work anywhere else as a CNA. (R. at 35.)

In 2001, she stayed home with her children. (R. at 36.) In 2002, she worked for Super Fresh Food markets in the deli department. (R. at 36.) When asked why she left that job, she responded that "[a]gain, my boyfriend I had at the time was abusive and I had to -- it was between me and my boss that we said . . . we would end it at this." (R. at 37.) When told that she had previously mentioned that she "left that job during the summertime because of the amount of people that would come in," she responded, "yes, it was all -- the people, I can't work around a lot of people." (R. at 37.)

After Super Fresh, she worked as an assistant in a pharmacy. (R. at 37.) When asked whether she had any difficulty working as a pharmacy assistant, she said "no" and that she left the job because she "just quit." (R. at 37.) When asked whether it was "true" that she was "having difficulty following instructions and didn't understand a lot of the procedures and the job was too difficult," she responded "yes" and clarified that she "left because I just quit because I knew that I was having problems with concentrating." (R. at 38.)

She also made hoagies seasonally at a Richard Baneli store and worked as a cashier for Family Dollar through 2009. (R. at 38.) She left her employment with Richard Baneli in September 2009 and has not worked since then because "I've had deep depression. My back went out. I have schizophrenia." (R. at 38.) She also left Richard Baneli because "there were too many people and I can't be around a lot of people like that." (R. at 39.)

She received medications, but no counseling, from Cape Counseling. (R. at 39.) She did not notice any improvement with the medications. (R. at 40.) In 2010, she became suicidal and was hospitalized for one week. (R. at 41.) When the ALJ questioned her about drug use indicated in the records from that hospital visit, she testified that she "tried to commit suicide because I had eight years clean and I relapsed that one day." (R. at 53.) She also attempted suicide in 1997. (R. at 41.)

During a short period in 2011, her son, uncle, aunt, and children's father all died; she was "devastated" and has not recovered. (R. at 42.)

In 2010, she began experiencing back pain, which affects her right leg. (R. at 43.) She takes medication for her back pain and it sometimes helps. (R. at 52.)

Plaintiff also has asthma and shortness of breath due to chronic obstructive pulmonary disease ("COPD"), which makes it

"really hard for [her] to walk." (R. at 44.) She has a breathing machine to treat the COPD. (R. at 44.)

She testified that, after 15 minutes of standing, her back "really hurts" and she must rest for 20 minutes. (R. at 45.) She cannot walk further than half a block because of back pain and because "I can't catch my breath and I have trouble breathing." (R. at 45.) After sitting for 20-25 minutes, she needs to move and needs a 15-minute break before sitting again. (R. at 46.) Her most comfortable position is sitting in her kitchen chair. (R. at 51.)

Her hands get numb sometimes, but she has not mentioned this problem to a doctor. (R. at 46.) She does not drive, has never driven, and does not have a license. (R. at 46.) She travels by fare-free bus to her appointments. (R. at 47.)

Her various medications cause shakiness, but no other side effects. (R. at 47.) She wakes up at night after only four hours of sleep because of back pain and then she is only able to sleep another 90 minutes. (R. at 47.) She takes a 90-minute nap during the day. (R. at 48.)

She has concentration problems. (R. at 49.) Sometimes "I just like stare at the space and then I . . . forget what I'm looking at." (R. at 49.) In her benefits application, Plaintiff wrote that she cannot follow written instructions because she gets distracted. (R. at 207.)

She lives alone and watches television during the day. (R. at 48.) She "do[es]n't want to be around anybody" and "when it's really windy out, I don't go outside because I am afraid something's going to fall on my head." (R. at 50.) In her benefits application, Plaintiff wrote that she cannot socialize or be around people, she wants to be alone, she does not want to leave her home, she does not answer her phone, and she has no ambition. (R. at 203, 219, 237, 240, 244.)

She testified that she does no chores and that a friend helps with cooking, cleaning, dishes, and laundry. (R. at 50.) In her disability application, Plaintiff wrote that she sometimes needs reminders to shower, she prepares frozen meals for herself daily, and she does laundry when she really needs it. (R. at 204.) In terms of her ability to care for personal needs, Plaintiff wrote, "I can do everything but often have no desire to bathe, brush my teeth, do my hair, put on make up, or even get dressed." (R. at 219.) She said a friend calls her to make sure she takes her medicine. (R. at 226.)

She sees a psychiatrist every two months for medication management. (R. at 51.) She wanted a therapist and she spoke with someone at Cape Counseling, but she stopped "because when she would ask me questions, I would start crying and I couldn't -- get it out what I was trying to say." (R. at 51.) At the hearing, she

testified that her depression level was eight on a scale from one to ten. (R. at 51.)

Aside from the one-time relapse in 2010, Plaintiff testified that she is sober. (R. at 53.) She does not participate in sobriety programs. (R. at 54.) She reduced her cigarette consumption from one-and-a-half packs per day to one-half pack per day. (R. at 54.)

She also takes medication for Hepatitis C and says the treatment is "going fine." (R. at 53-54.)

The state pays for her housing and, before she had her apartment, she was homeless for one month. (R. at 55.)

### C. Medical History

#### 1. Plaintiff's Diagnoses

Plaintiff has been diagnosed with degenerative disc disease of the lumbar spine, major depressive disorder, asthma, schizoaffective disorder, panic disorder with agoraphobia, obesity, COPD, lumbar radiculopathy, hypertension, Hepatitis C, and cocaine addiction. (R. at 287, 341, 396, 416, 457, 486, 515-16, 518, 540, 608.)

#### 2. Mental Health

On March 15, 2010, Plaintiff sought help from Cape Counseling Services complaining of "crying often," "racing thoughts," and "stressed out, snapping out at people, heart palpitations, anxious, [history] of suicidal thoughts." (R. at 566.) One care

8

provider noted that Plaintiff "is anxious, tearful at times." (R. at 568.) A doctor noted that Plaintiff said she suffered from mild-moderate anxiety and that stress aggravates her anxiety. (R. at 404.) On that visit, Plaintiff said that she "[s]tarts job in May, not worried about work at all." (R. at 566.)

Dr. Charles Dick prescribed her various psychiatric medications, and saw Plaintiff for medication assessment/monitoring approximately every three months. (R. at 536.)

### 3. Back Pain

On May 4, 2010, Plaintiff went to Cape Regional Medical Center and the triage nurse noted that her chief complaint was "back pain now so bad going down both legs H[istory] of same had epidural 2 weeks ago no improvements reports ran out of pain meds." (R. at 326.) On August 7, 2009, Plaintiff went to the Cape Regional Medical Center complaining that her back "just went out" while she was getting out of the shower. (R. at 285.) On February 4, 2010, Plaintiff went to Cape Regional Medical Center again complaining of "aching, sharp and shooting" back pain. (R. at 291.) An exam revealed that her lower back was tender and painful with limited range of motion. (R. at 292.)

### 4. Substance Abuse

Plaintiff was hospitalized in July of 2010 and admitted to cocaine abuse; as her hospitalization progressed, her mood

improved and there were no significant behavioral issues. (R. at 349-350.) While hospitalized, she told a doctor that her stressors included her recent relapse on cocaine and said, "'I used a bag a day before admission after being sober for 8 yrs.'" (R. at 352.) When she was admitted, her Global Assessment of Functioning ("GAF")[1] score was 10. (R. at 368.) When she was discharged, her GAF score was 60. (R. at 580.) Notes from an August 9, 2010 examination indicated improvements in Plaintiff's mood, impulse control, sleep, and appetite. (R. at 540.)

### 5. Doctors' Assessments

Dr. Charles Dick at Cape Counseling met with Plaintiff every few months to monitor her medications. On May 24, 2011, he wrote "mem/conc fair; speech coherent, goal direction; no ah, vh, si, hi; affect/mood guarded; r/j fair." (R. at 532.) His notes on March 29, 2011, December 14, 2010, and October 26, 2010 were identical except he noted that her affect/ mood was "anxious." (R. at 533, 537, 538.) On September 13, 2010, Dr. Dick noted "affect/mood=anxiety." (R. at 539.) His notes on January 27, 2011

---

[1] "The GAF scale ranges from 0 to 100 and indicates a clinician's judgment of a patient's overall symptom severity and functioning level. A GAF of 51–60 indicates a person with moderate symptoms or moderate difficulty in social, occupation, or school functioning. A GAF of 61–70 indicates a person with some mild symptoms or some difficulty in social, occupational, or school functioning, but who is generally functioning well and has some meaningful interpersonal relationships." Williams v. Comm'r of Soc. Sec. Admin., Civ. 12-5637, 2013 WL 4500335, at *6 n.1 (D.N.J. Aug. 21, 2013) (citing DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 32 (4th ed., 2000)).

were also identical except he noted that her affect/mood was
"depressed." (R. at 534.) On August 9, 2010 and July 27, 2010, he
noted her affect/mood was "positive" and that she had a history of
cocaine addiction. (R. at 540.) Essentially, Dr. Dick consistently
found that Plaintiff's memory and concentration were fair and her
speech was coherent and goal directed. Her affect and mood varied
between depressed, anxious, guarded, and positive.

On October 26, 2010, Dr. Joseph Michel, a medical consultant
for the New Jersey Division of Disability Determination, opined
that Plaintiff could lift twenty pounds occasionally, ten pounds
frequently and sit for six hours in an eight-hour workday. (R. at
126.) He determined that Plaintiff had no postural, manipulative,
communicative, or visual limitations. (R. at 127-129.) He found
that she did not have environmental limitations, except that she
should avoid concentrated exposure to fumes, odors, dusts, gases,
and poor ventilation due to her asthma. (R. at 429.)

Dr. Seifer, a licensed psychologist, conducted a consultative
medical examination on November 30, 2010. Plaintiff denied any
history of alcohol and drug abuse. (R. at 485.) Dr. Seifer noted
that Plaintiff "had some difficulty following the conversation due
to her circumstantial thinking." (R. at 485.) He found that her
attention was adequate, but her concentration was impaired. (R. at
485.) Plaintiff told Dr. Seifer that she has feelings of paranoia:
"I think cops are breaking into my house. I see shadows. I have

11

heard my dead brother talking to me at night: everything's gonna be alright." (R. at 485.) Dr. Seifer found that her GAF score was 50. (R. at 484-486.) He concluded that Plaintiff's "moderate/severe limitations are due to a combination of the mental and physical status and are enduring." (R. at 486.) He noted that Plaintiff can function independently and "can handle her finances, should be able to continue to do so." (R. at 485-86.)

Dr. Nenuca Bustos, a medical consultant for the New Jersey Division of Disability Determinations, examined Plaintiff on December 15, 2010 and wrote that Plaintiff "lives alone independently. Takes care of personal needs. Able to prepare simple meals, do laundry, go out alone, use public transportation, shop for necessities, handle her money, keep her appointmen[ts] . . . able to follow simple instructions." (R. at 529.) Dr. Bustos noted "memory/concentration fair. Speech coherent, goal directed." (R. at 529.) Dr. Bustos noted that Plaintiff "reports no friends, does not socialize." (R. at 529.) Dr. Bustos found that Plaintiff suffered mild restriction of her daily living activities; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and one or two episodes of decompensation. (R. at 523.) Dr. Bustos concluded, "severity of [Plaintiff]'s mental impairment imposes some limitations in her functioning but not to the degree of

severity that prevents [her] from living independently and still allowing [her] to retain her capacity to understand, remember and follow simple instructions, make simple decisions and do simple, work related mental activities." (R. at 529.)

On March 29, 2011, Dr. Joshua Weisbrod, a medical consultant for the New Jersey Division of Disability Determination, noted that Plaintiff had "[n]o problems with personal care." (R. at 575.) He concluded that she had the "ability to perform a full range of light work." (R. at 575.)

On March 31, 2011, Dr. Joseph Wieliczko noted Plaintiff "is oriented, speech is normal, psychotic features (which is not supported by the TP records and is consistent with cocaine use) . . . cognitive functioning is adequate . . . ." (R. at 576.) He concluded that Plaintiff "was less than truthful when asked about her drug/alcohol history . . . ." (R. at 576.)

Dr. Andrew Alloy examined Plaintiff on June 11, 2011, diagnosed her with Hepatitis C, recommended a follow-up visit to consider new medication, and found no problems with her heart, lungs, abdomen, and bowels. (R. at 597.) When Dr. Alloy saw Plaintiff on May 4, 2011, she denied any history of alcohol use. (R. at 599.)

**D. ALJ's Decision**

The ALJ found that Plaintiff had a disability but, because substance abuse disorders materially contributed to the disability determination, Plaintiff was not disabled under the Social Security Act.

The ALJ found that Plaintiff met insured status requirements through March 31, 2012, had not been engaged in substantial gainful activity since September 30, 2009, and had the following severe combination of impairments: degenerative disc disease of the lumbar spine, asthma, hepatitis C virus, schizoaffective disorder, major depressive disorder, panic disorder with agoraphobia, and polysubstance abuse. (R. at 15-16.) The ALJ also noted that Plaintiff suffered from hypertension, palpitations, and foot calluses, but he found that those impairments were not severe because there was no evidence that they limited her ability to do work-related activities. (R at 16.) He found that this combination of disabilities met or equaled listed impairments. (R. at 19.)

He recounted visits to the emergency room in which Plaintiff complained of severe low back pain, was observed to walk with a slight limp, and had limited and painful range of motion of her lumbar spine. (R. at 16.) He summarized Plaintiff's visit to Dr. Alloy, in which she was diagnosed with Hepatitis C. (R. at 19.) He noted Plaintiff's complaints of seeing shadows, hearing her dead brother speaking to her, and suffering panic attacks. (R. at 19.)

14

The ALJ found that Plaintiff "had moderate restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; and she had one or two episodes of decompensation, each of extended duration." (R. at 20.)

He found, however, that substance abuse contributed materially to Plaintiff's disability. He gave "great weight" to the assessments of Drs. Michel, Weisbrod, Wieliczko, and Bustos. (R. at 17, 19-20.) He noted that Dr. Michel opined that Plaintiff could lift and carry twenty pounds occasionally, ten pounds frequently, sit for six hours in an eight-hour workday, stand/walk for six hours in an eight-hour workday, and has no postural or manipulative limitations. (R. at 17.) He summarized Dr. Bustos' findings, including her opinion that Plaintiff "retains the capacity to understand, remember and follow simple instructions, make simple decisions, and do simple work-related mental activities." (R. at 19.) The ALJ specifically noted that "Dr. Wieliczko . . . reported that the claimant was less than truthful about her drug/alcohol history, . . . and [Dr. Wieliczko] noted that claimant's psychotic features were not supported by treating physician's records, but rather consistent with cocaine use." (R. at 20.)

The ALJ found that Plaintiff was "not credible regarding her alcohol and cocaine abuse." (R. at 20.) He noted that she "denied having a history of alcohol or cocaine use to Dr. Seifer and when seen at the emergency room in February 2010; and she reported to Dr. Bhamidipati that she had stopped drinking alcohol in 2009; but in March 2010 she had reported that she rarely drank alcohol and that she had not used cocaine in more than ten years." (R. at 20 (internal citations omitted).) He contrasted that evidence with information that "on July 14, 2010 she reported having a chronic history of alcoholism and seizures and she was requesting inpatient rehabilitation." (R. at 20.)

The ALJ emphasized evidence about the impact of Plaintiff's substance abuse. He noted that "[o]n July 20, 2010, the claimant was hospitalized due to suicidal ideation, and her GAF was estimated to be 10. At the time of admission, she admitted using cocaine; however, by the time of discharge on July 23, 2010, just a few days later, she was free of the effects of cocaine, and her mood had improved and her GAF score had risen to 60 . . . ." (R. at 20.) He also noted that, when Plaintiff was seen in August 2010, she reported that her mood, appetite, impulse control, and sleep had all improved. (R. at 20.) Treatment notes from December 2010, several months later, indicate that her mood was stable, and she had no unusual anxiety or evidence of depression. (R. at 20.)

16

The ALJ noted that "when the claimant filed her supplemental security income application through teleclaim, it was noted that the claimant had no difficulty with understanding, coherency, and concentration and was able to answer all questions asked." (R. at 22 (citing R. at 164).) He also noted that treatment notes from Cape Counseling Services indicate that, in March 2010, Plaintiff reported that she would start a job in May and that she was not worried about work at all. (R. at 22.)

He concluded that "the claimant's reported restrictions are not fully persuasive to the extent alleged, when considered with the totality of the medical evidence of record" and that "the reports of the treating and examining physicians provide substantial evidence that the claimant's impairments, without [drug & alcohol abuse], do not impose such severe limitations on her functional capacity as to preclude the performance of all work activity." (R. at 23.)

The ALJ concluded that "[i]f the claimant stopped the substance use, . . . the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment . . . ." (R. at 22.)

17

He found that, without substance abuse, "the claimant
demonstrates a mild degree of limitation in the activities of
daily living area of functioning; a mild degree of limitation in
the social functioning area of limitation; a moderate degree of
limitations in the concentration, persistence and pace area of
functioning." (R. at 22.) The ALJ explained that "'moderate' means
the claimant can perform these functions at a competitive level on
a regular and sustained basis." (R. at 22.) He found that the
evidentiary record did not indicate that Plaintiff experienced
repeated episodes of decompensation of extended duration, that a
minimal increase in mental demands or changes in her environment
would cause decompensation, or that Plaintiff could not function
outside of a highly supportive living arrangement. (R. at 22.)

He concluded that if Plaintiff "stopped the substance abuse,
the claimant would not have an impairment or combination of
impairments that meets or medically equals any of the impairments
listed in [the code of federal regulations]." (R. at 21.)

He defined her residual functioning capacity ("RFC"): "If the
claimant stopped the substance use, the claimant would have the
residual functional capacity to perform light work . . . except
she must avoid concentrate exposure to environmental irritants,
and she cannot perform food service work due to her hepatitis. In
addition, she is limited to unskilled tasks and to goal-oriented
rather than production-paced tasks and she requires a stable

18

workplace with few, if any changes of setting, processes and tools." (R. at 21.)

He noted Plaintiff's past relevant work as a cashier, the classification of that position as "unskilled, light work," and held that Plaintiff could perform this job. (R. at 23.)

He concluded that Plaintiff was not disabled.

**E. Plaintiff's Arguments**

Plaintiff asks the Court to reverse the Commissioner's final Order of "no disability" or to remand this case. She challenges the Commissioner's findings at steps four and five of the disability-determination process. Plaintiff argues that the ALJ failed to properly evaluate her RFC by: ignoring limitations associated with her myriad medical problems; failing to define "goal-oriented" versus "production-paced"; failing to properly weigh Plaintiff's testimony and evidence from her treating physicians; failing to explain the reasons for dismissing Plaintiff's testimony and evidence from her treating physicians; and failing to properly evaluate her drug use because there is no evidence that Plaintiff would not be disabled absent her drug use. In addition, Plaintiff asserts that the Dictionary of Occupational Titles ("DOT") definition of cashier is inconsistent with Plaintiff's RFC, thus showing that Plaintiff is incapable of performing her past work as a cashier. Plaintiff also argues that

the ALJ erred at step five by failing to consult a vocational expert.

## III. ANALYSIS

### A. Standard of Review

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). In other words, "[t]he Court is bound by the ALJ's findings of fact if they are supported by substantial evidence in the record." Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999). Substantial evidence means more than "a mere scintilla." Richardson v. Perales, 402 U.S. 389, 401 (1971). It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. "[T]he substantial evidence standard is a deferential standard of review." Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004).

### B. Legal Standard For Determination of Disability

Under the Social Security Act, a "disability" is defined, for the purposes of an entitlement to benefits, as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A claimant is unable to engage in any substantial gainful activity "only if his physical or mental impairment or impairments are of

such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work . . . ." 42 U.S.C. § 1382c(a)(3)(B).

The disability determination involves a five-step sequential process:

> In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity . . . .

> In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment . . . .

> In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work . . . . If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five.

> Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work . . . . If the claimant is unable to resume her former occupation, the evaluation moves to the final step.

> At this stage, . . . the Commissioner . . . must demonstrate the claimant is capable of performing other available work . . . .

Plummer, 186 F.3d at 428 (internal citations omitted).

In cases involving substance abuse, there is additional analysis because "[a]n individual shall not be considered to be disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C).

"The key factor . . . in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol." 20 C.F.R. § 404.1535(b)(1).

On appeal, Plaintiff challenges the ALJ's decisions at steps four and five.

### C. The ALJ Properly Determined Plaintiff's RFC at Step 4

#### i. The ALJ Properly Considered Plaintiff's Testimony

Plaintiff argues that the ALJ improperly weighed her testimony. This argument lacks merit.

An ALJ need not accept an applicant's statements about her own symptoms at face value. The ALJ has discretion to assess the credibility to be given to such statements in line with guidance in the SSA's regulations. "[T]he extent to which an individual's statements about symptoms can be relied upon as probative evidence in determining whether the individual is disabled depends on the credibility of the statements." Titles II & Xvi: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, SSR 96-7P, at *4 (S.S.A July 2, 1996). The ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Id. "The

adjudicator must also consider any observations about the individual recorded by Social Security Administration (SSA) employees during interviews, whether in person or by telephone." Id. at *5. In addition, "[t]he adjudicator must compare statements made by the individual in connection with his or her claim for disability benefits with statements he or she made under other circumstances." Id. Essentially, "'[c]redibility determinations are the province of the ALJ and only should be disturbed on review if not supported by substantial evidence.'" Hall v. Astrue, 882 F. Supp. 2d 732, 736 (D. Del. 2012) (quoting Pysher v. Apfel, 2001 WL 793305, at *3 (E.D. Pa. July 11, 2001)).

The ALJ found that Plaintiff was not credible, and substantial evidence supports his conclusion. He noted that "when the claimant filed her supplemental security income application through teleclaim, it was noted that the claimant had no difficulty with understanding, coherency, and concentration and was able to answer all questions asked." (R. at 22 (citing R. at 164).) He also cited March 2010 treatment notes from Cape Counseling indicating that Plaintiff "reported she would be starting a job in May and she was not worried about work at all." (R. at 22.)

The ALJ found that Plaintiff was "not credible regarding her alcohol and cocaine abuse." (R. at 20.) He noted that she "denied having a history of alcohol or cocaine use to Dr. Seifer and when

seen at the emergency room in February 2010; and she reported to
Dr. Bhamidipati that she had stopped drinking alcohol in 2009; but
in March 2010 she had reported that she rarely drank alcohol and
that she had not used cocaine in more than ten years." (R. at 20.)
He contrasted that evidence with information that "on July 14,
2010 she reported having a chronic history of alcoholism and
seizures and she was requesting inpatient rehabilitation." (R. at
20.)

The ALJ also had the benefit of meeting Plaintiff and
observing her testimony and demeanor at the hearing on March 6,
2012.

Plaintiff argues that ample records during times of sobriety
show her disabling mental limitations and that there is no
evidence that she would not be disabled absent her drug use. But
Plaintiff did not provide evidence of her sobriety, other than her
own statements attesting to her lack of substance abuse.

Moreover, the ALJ emphasized evidence about the impact of
Plaintiff's substance abuse. He noted that "[o]n July 20, 2010,
the claimant was hospitalized due to suicidal ideation, and her
GAF was estimated to be 10. At the time of admission, she admitted
using cocaine; however, by the time of discharge on July 23, 2010,
just a few days later, she was free of the effects of cocaine, and
her mood had improved and her GAF score had risen to 60 . . . ."
(R. at 20.) In other words, he emphasized that her GAF score rose

24

50 points within a few days due to the absence of cocaine. He also noted that, in August 2010, Plaintiff reported improvements in her mood, appetite, impulse control, and sleep. (R. at 20.) He cited treatment notes from December 2010, which indicate that her mood was stable and that she had no unusual anxiety or evidence of depression. (R. at 20.)

In addition, he cited Dr. Wieliczko's findings that Plaintiff was not truthful about her drug and alcohol use and that her psychotic conditions were consistent with cocaine use. He noted Dr. Bustos' conclusions that "claimant's mental impairments impose[] some limitations in her functioning but not to the degree of severity that prevents [her] from living independently" and that "the claimant retain[ed] the capacity to understand, remember and follow simple instructions, make simple decisions and do work related mental activities." (R. at 20.)

Essentially, the ALJ cited multiple sources that informed his assessment that Plaintiff lacked credibility about her substance abuse. This evidence is reasonable, is far more than a scintilla, and is substantial. It supports the ALJ's findings that the Plaintiff lacked credibility about her substance abuse and that substance abuse contributed materially to her disability. Moreover, Plaintiff's argument that the ALJ failed to explain his reasoning for discounting her testimony lacks merit; he provided ample explanation. Due to the substantial evidence in the record,

the Court is bound by the ALJ's finding that Plaintiff's testimony was not credible.

### ii. The ALJ Properly Considered Medical Evidence

Plaintiff argues that the ALJ "discarded the medical opinions provided by Cape Counseling Services (Dr. Charles Dick), Cape Regional Medical Center, Dr. Seifer, and Dr. Alloy." (Pl. Br. at 14.) In support of this argument, Plaintiff cites 131 pages of the record and asserts that this evidence supports Plaintiff's symptoms, including crying spells, racing thoughts, regular panic attacks, feelings of isolation, depression, paranoia, suicidal ideations, seeing shadows and hearing voices, impaired concentration, fatigue, and low GAF scores. Plaintiff also noted that "Dr. Dick's records provide the benefit of a longitudinal picture of the Plaintiff's mental impairments . . . ." (Id. at 14.)

The ALJ must "accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Plummer, 186 F.3d at 429).

Dr. Dick consistently found that Plaintiff's memory and concentration were fair and her speech was coherent and goal directed. His records do not indicate that Plaintiff is incapable of cashier work. Dr. Alloy's records indicate that Plaintiff has

26

Hepatitis C, not that she is incapable of cashier work. The ALJ found that Plaintiff denied her history of substance abuse to Dr. Seifer; Dr. Seifer's records do not negate the ALJ's findings about Plaintiff's credibility.

As a general matter, the ALJ's consideration of Plaintiff's impairments and medical history was extensive. He found that Plaintiff had degenerative disc disease of the lumbar spine, asthma, hepatitis C virus, schizoaffective disorder, major depressive disorder, panic disorder with agoraphobia, and polysubstance abuse, hypertension, palpitations, and foot calluses. (R at 15-16.) The ALJ found that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [RFC] assessment . . . ." (R. at 22.)  He noted there was no evidence indicating that Plaintiff experienced repeated episodes of decompensation of extended duration, that a minimal increase in mental demands or changes in her environment would cause decompensation, or that Plaintiff required a highly supportive living arrangement to function. (R. at 22.) The ALJ found that substance abuse contributed materially to her disability and that, absent substance abuse, she was capable of performing her past relevant work as a cashier.

Plaintiff's brief repeatedly cites her testimony, her statements in her benefits application, and her statements to

27

treating physicians about her disabilities. "An ALJ must give serious consideration to a claimant's subjective complaints of pain, even where those complaints are not supported by objective evidence," Mason v. Shalala, 994 F.2d 1058, 1067 (3d Cir. 1993), "[a]lthough the ALJ can reject such claims if he does not find them credible," Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 433 (3d Cir. 1999). In addition, "[a]n individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability . . . ." 42 U.S.C. § 423(d)(5)(A). Moreover, "the mere memorialization of a claimant's subjective statements in a medical report does not elevate those statements to a medical opinion." Morris v. Barnhart, 78 F. App'x 820, 824 (3d Cir. 2003); see also McKinnon v. Comm'r of Soc. Sec., Civ. 12-4717 (NLH), 2013 WL 5410696, at *3 n.2 (D.N.J. Sept. 26, 2013) ("[s]imply because this doctor and others noted Plaintiff's complaints of pain does not automatically require the ALJ to accept the credibility of Plaintiff's complaints").

The ALJ thoroughly reviewed Plaintiff's medical history, found that Plaintiff's testimony was not credible, substantial evidence supported that finding, and this Court is bound by his finding. Where substantial evidence supports the ALJ's finding set forth in articulated reasoning, the district court is not "empowered to weigh the evidence or substitute its conclusions for

those of the fact-finder." <u>Williams v. Sullivan</u>, 970 F.2d 1178, 1182 (3d Cir. 1992).

### iii. Cashier Work Is Consistent with Plaintiff's RFC

Plaintiff argues that the ALJ failed to define "goal-oriented" versus "production-paced." Plaintiff also asserts that the Dictionary of Occupational Titles ("DOT") definition of cashier is inconsistent with Plaintiff's RFC because the DOT states that cashier work requires an individual to perform Reasoning Level 3 work, which necessitates an ability to handle problems involving several concrete variables and thus conflicts with the RFC limiting Plaintiff to a stable workplace with few changes in processes. Plaintiff also notes that cashier work requires Specific Vocational Preparation Level 2 ("SVP 2"), which can involve up to one month of training, and argues that Plaintiff's panic disorder and inability to interact with others make her incapable of SVP 2 work.

The ALJ found that "[i]f the claimant stopped the substance use, the claimant would have the residual functional capacity to perform light work . . . ." (R. at 21.) He noted Plaintiff's past relevant work as a cashier and the classification of that position as "unskilled, light work." (R. at 23.) The DOT classifies a cashier position as "Light Work," which requires "Reasoning: Level 3 - Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with

29

problems involving several concrete variables in or from standardized situations" and SVP 2, which is "[a]nything beyond short demonstration up to and including 1 month . . . ." DICOT 211.462-010, 1991 WL 671840.[2]

The ALJ was not required to explain Plaintiff's ability to perform every component of the DOT definition for cashier work. "The claimant bears the burden of demonstrating an inability to return to her past relevant work." Plummer, 186 F.3d at 428. Plaintiff argues that "[h]ow she can be expected to work closely with another co-worker for up to one-months' time is left unclear." (Pl. Br. at 24.) Plaintiff also argues that the ALJ failed to address her obesity and chronic liver disease and that "there is no indication that her obesity or chronic liver disease have no effect on her ability to perform basic work activities on a regular and continuing basis." (Pl. Br. at 13.) These arguments are inapt because Plaintiff bears the burden of demonstrating that she cannot perform her past relevant work; the Commissioner does not carry the burden of demonstrating that she can. Plaintiff cites multiple sources identifying her medical impairments, but

---

[2] Plaintiff also argues that "the job of cashier often involves the handling of food items which would also be precluded due to the claimant's restriction due to hepatitis." (Pl. Reply at 6.) Plaintiff cites no authority for this statement and does not allege that her past work as a cashier involved handling unpackaged food. In any event, there are many cashier jobs that do not involve handling food, as shown by everyday experience in department stores, office supply stores, home improvement stores, movie theaters, boutiques, and the like, too numerous to list.

she does not cite sources, other than her own statements, about how those impairments impact her ability to function in a work environment. As discussed supra, substantial evidence supports the ALJ's determination of Plaintiff's credibility and this Court is bound by that determination. Plaintiff did not sustain her burden at step four.

Furthermore, "[w]hile the ALJ did not explicitly discuss the [difference between goal-oriented and production-paced], Plaintiff does not explain that evidence's probative value to the central inquiry of 'whether we would still find [Plaintiff] disabled if [she] stopped using drugs or alcohol.'" Martin v. Comm'r of Soc. Sec., 13-2150, 2013 WL 6501335, at *4 (3d Cir. Dec. 12, 2013) (quoting 20 C.F.R. § 404.1535(b)(1)). Moreover, there is no obvious contradiction in an RFC that requires a stable workplace with few changes of setting, processes, and tools, and a work description that requires the ability to reason with several concrete variables. Plaintiff's RFC limits her workplace setting, processes, and tools; it does not describe reasoning limitations.

Finally, Plaintiff cites her statements about her need for reminders to handle her personal care, her inability to interact with others, and her fears of leaving the home. These arguments are inapposite. The Court defers to the ALJ's findings when they are supported by substantial evidence and, as discussed supra, the

31

ALJ's assessment of Plaintiff's credibility is supported by substantial evidence.

### D. This Case Did Not Require Step 5 Analysis

Plaintiff argues that "the nonexertional limitations involved in this case made it necessary to consult a vocational expert to determine the extent of erosion of Plaintiff's occupational base." (Pl. Br. at 23.)

At step five, the Commissioner must show that work exists in significant numbers in the national economy which the claimant could perform. Sykes v. Apfel, 228 F.3d 259, 263 (3d Cir. 2000). The Commissioner can satisfy this burden by introducing testimony from a vocational expert. Id.

In this case, the ALJ did not need to consult a vocational expert because he found that Plaintiff was capable of performing her past relevant work and, thus, the sequential analysis did not proceed to step five. See Miranda v. Barnhart, Civ. 03-333, 2005 WL 705343, at *4 (D. Del. Mar. 28, 2005) ("Because ALJ Antrobus determined that [Plaintiff] was not disabled at step four of the analysis, it was unnecessary for him to proceed to step five"). Step five analysis only occurs when the ALJ determines that the claimant cannot perform past relevant work.

Plaintiff argues that the ALJ failed to adhere to the Third Circuit's holding in Sykes v. Apfel and that "the ALJ's failure to consult a vocational expert in this matter, again where

32

significant nonexertional limitations are at play, also violates SSRs 96-9p and 83-12." (Pl. Br. at 24.) Sykes and SSRs 96-9p and 83-12 are all inapt because they address step five analysis. See Sykes, 228 F.3d at 262 & 266 ("the ALJ found that Sykes had several severe impairments . . . and that he could not perform his past work" and the key issue "raised by Sykes's appeal [wa]s whether the Commissioner met his burden of proof for the step-five inquiry"); Titles II & Xvi: Determining Capability to Do Other Work, SSR 96-9P, at *1 (S.S.A July 2, 1996) ("Under the sequential evaluation process, once it has been determined that an individual . . . has a 'severe' medically determinable impairment(s) which . . . prevents the individual from performing past relevant work (PRW), it must be determined whether the individual can do any other work"); Titles II & Xvi: Capability to Do Other Work, SSR 83-12, at *1 (S.S.A 1983) ("If a person has a severe medically determinable impairment which . . . prevents the person from performing past relevant work, we must decide whether he or she can do other work"). When the ALJ finds that the claimant is able to perform past relevant work, none of these sources require an ALJ to consult a vocational expert at step four, regardless of the nature of the claimant's impairments.

The ALJ did not err by not consulting a vocational expert because his analysis did not reach step five of the sequential process.

## IV.    CONCLUSION

The Commissioner's denial of social security benefits will be affirmed because substantial evidence supports the ALJ's determination of Plaintiff's credibility; the ALJ properly considered Plaintiff's medical evidence; cashier work is consistent with Plaintiff's RFC; and this case did not require a step five analysis. The ALJ's decision will be affirmed and the accompanying Order will be entered.


**March 10, 2014**                         **s/ Jerome B. Simandle**
Date                                 JEROME B. SIMANDLE
                                     Chief U.S. District Judge